UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

KYRA H.                                                        Case No. 6:18-cv-01979-AC

                                    Plaintiff,                 OPINION AND ORDER

                v.

COMMISSIONER,
Social Security Administration,

                                    Defendant.
_____

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff Kyra M. H.[1] ("Plaintiff") filed this lawsuit under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner"), who denied her social security disability

insurance benefits ("DIB") and supplemental security income ("SSI") (collectively "Benefits").

_____

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case, as well as any individual related to that party.

PAGE 1 - OPINION AND ORDER

The court finds the ALJ's discounting of Plaintiff's testimony, lay testimony, and limitations provided by a treating medical provider was supported by substantial evidence in the record and not in error, and that the ALJ's failure to specifically discuss Plaintiff's symptom disorders while evaluating evidence was harmless error. Accordingly, the Commissioner's final decision is affirmed.[2]

*Procedural Background*

In May 2014, Plaintiff filed applications for DIB and SSI alleging a single onset date of June 5, 2013. The applications were denied initially, on reconsideration, and by Robert Frank Spaulding, the Administrative Law Judge (the "ALJ"), after a hearing. The Appeals Council considered additional evidence in the form of a letter from Plaintiff to her legal counsel and photographs of her hands but denied review, and the ALJ's decision became the final decision of the Commissioner.

*Factual Background[3]*

Plaintiff is fifty years old. She graduated from high school and completed two years of college. Her past relevant work experience includes domestic violence counselor, central supply worker, and receptionist. Plaintiff has not been involved in a successful work attempt since June 5, 2013. Plaintiff alleges disability because of degenerative disc disease; bone spurs; two torn discs; depression; body numbness; back, leg, and arm weakness; dizziness; light-headedness;

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

[3] Plaintiff asserts the ALJ erred when considering her physical limitations and defining her residual functional capacity, specifically her ability to stand and/or walk for six hours in an eight-hour day or attend work without extensive absences. Consequently, the court relies primarily on evidence relating to symptoms and limitations resulting from Plaintiff's physical ailments.

PAGE 2 - OPINION AND ORDER

intermittent blurred vision with one blackout episode; swallowing, bladder, back, and balance issues; stenosis; arthritis; possible multiple sclerosis; muscle cramping; severe fatigue; difficulty concentrating; nausea; spine pressure; back stiffness; and sensitivity to light. Plaintiff last met the insured status requirements entitling her to DIB on December 31, 2018.

I. Testimony

    *A. Plaintiff*

    In the Function Report completed by Plaintiff on May 26, 2014 (the "Report"), Plaintiff reported she lived alone and, although it took longer, required some modifications, and often resulted in symptoms, she was able to effectively care for herself. (Tr. of Social Security Administrative R., ECF No. 13 ("Admin. R."), at 319-21.) She described her average day as follows: "I get up take shower eat breakfast. Limit my activity as much as possible so as to limit my symptoms. The more I do activity wise the more and quicker my weakness and numbness acts up. And I would most of the time like to be prescription drugless as the[y] d[e]bilitate me as well." (Admin. R. at 320.)

    Plaintiff prepared her own meals, often merely microwaving leftovers or frozen items, and needed to lay down regularly when cooking a meal, cleaning her house, and doing laundry. (Admin. R. at 321-22.) She did not do yard work due to allergies, stiffness, and pain. (Admin. R. at 322.) She maintained her drivers' license but did not drive more than a half block to get her mail, relying on others to take her to doctor's appointments and the grocery store. (Admin. R. at 319, 322.) She went grocery shopping every other week, was able to stand and walk for only thirty minutes to an hour, needed to lean on the cart for support, and was unable to do anything else for the rest of the day. (Admin. R. at 322.) She reported watching television daily, but sometimes

PAGE 3 - OPINION AND ORDER

had difficulty concentrating, and visited with friends and family by telephone, or in-person when they had time to drop by her house. (Admin. R. at 323-24.)

Plaintiff explained she was unable to sit, stand, or walk for long time periods, and suffered from numbness and weakness in her legs and sometimes her arms; weakness in her back; pain and stiffness in her legs, back, and neck; difficulty concentrating and focusing; memory issues; and severe depression. (Admin. R. at 319, 323.) She had difficulty sleeping at due to insomnia and serious fatigue but slept often throughout the day. (Admin. R. at 320.) She believed her conditions limited her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. (Admin. R. at 324.) She was able to walk one block before needing to rest and used a cane or grocery cart for support. (Admin. R. at 324-25.)

In mid-October 2014, Plaintiff fell, resulting in what she described as an increase in the pain, weakness, and stiffness in her legs, and new deep pain in her hip, pelvis, lower back, and right hand, as well as light-headedness with standing. (Admin. R. at 337.) In early 2015, Plaintiff reported "increasing daily numbness, weakness, shakiness, genital & body numbness & pain, loss of balance, decreased motor skills, increased swallowing & breathing issues decreased mental function – deteriorating regularly," which resulted in "increased pain, weakness, numbness in hands/arms causes inability to handle heav[i]er or small objects, or write, decreased motion skills & cognitive abilities, decreased household functioning." (Admin. R. at 346.)

At the September 27, 2017 video conference hearing before the ALJ (the "Hearing"), Plaintiff testified she hurt her back at work on June 5, 2013, when she lifted a heavy box and felt a sharp pain in her back, numbness in her left leg, and weakness in both legs. (Admin. R. at 55.) Audrey Duke, F.N.P. ("Duke"), who treated Plaintiff immediately after her injury, released

PAGE 4 - OPINION AND ORDER

Plaintiff to return to work on July 2, 2013, with light duty restrictions on condition of the ability to change positions at will and lay down on occasion. (Admin. R. at 61, 495.) Plaintiff attempted to work as a receptionist but was unable to "handle it physically" and did not return after the first day. (Admin. R. at 62.) Later that year, she was able to work for a week and a half at a domestic violence center but had to quit "because my body and my mind just couldn't wrap itself around the job." (Admin. R. at 80.)

Plaintiff testified she lived by herself, cooked her own meals, managed her finances, used a computer, enjoyed Facebook, and played video games. (Admin. R. at 72, 75-78.) During an average day, Plaintiff makes breakfast, takes a shower, does some dishes, vacuums, and takes a nap in the afternoon. (Admin. R. at 74.) She has constant weakness and numbness in her legs with varying severity. (Admin. R. at 83.) Twelve-to-thirteen days a month, Plaintiff woke-up exhausted or unable to stand for very long due to increased numbness and weakness in her legs. (Admin. R. at 73, 84.) When she tried to push herself on a bad day, she was more likely to fall and injure herself. (Admin. R. at 82-83.) Plaintiff indicated she drove a quarter mile to a small convenience store to buy sodas and snacks, but was unable to walk that far. (Admin. R. at 69.) A friend drives Plaintiff to Walmart once a week to buy groceries. (Admin. R. at 70.) Plaintiff spends only ten to thirty minutes in Walmart due to back pain. (Admin. R. at 71.)

In a May 12, 2018 letter to her lawyer, Plaintiff updated her condition and resulting limitations, and commented on medical notes and the ALJ's decision, apparently in support of her appeal. (Admin. R. at 377-381.) Plaintiff indicated she no longer was able to do housework or pay bills without the assistance of her friend; she needed to rest for a couple days before a trip to the grocery store, which resulted in pain that forced her to be "down" for the rest of the day and most of the next; and though she reported she cooked a Thanksgiving dinner for her family, she

did not do it by herself and she was "wiped out" for the next two days. (Admin. R. at 377-380.)

Plaintiff stated:

> Since the judge[']s decision I have fallen a few times due to leg weakness numbness and buckl[]ing, this last time I fell trying to do house work. I couldn[']t lift my weight to get me on the couch even and had to go to the hospital, by ambulance, was there a couple of days. [W]as released with walker that I now use, sometimes I can use my cane, cause my left leg isn[']t recovering very well. MRI shows that I now have a problem forming in my L3 area as well. I have been approved to go to phy[s]ical therapy to learn how to use thes[e] things properly c[au]se I am so brutally uncoordinated, I need help with that. Was also approved (if we can find one willing to) to go see neuro spine doctor for consult and hopeful[l]ly a point in[] the RIGHT direction for answers.

(Admin. R. at 380-81.)

### B. Phyllis Vanes

On July 13, 2014, Phyllis Vanes ("Vanes"), completed a Function Report addressing Plaintiff's limitations. (Admin. R. at 327.) At that time, Vanes had known Plaintiff for ten years and was spending three-to-four hours a week with Plaintiff providing her transportation for weekly grocery shopping and other errands. (Admin. R. at 327.) Vanes reported Plaintiff:

> is unable to drive due to muscle weakness and locking up suddenly, she is in constant pain, can not walk around for extended periods[,] can not sit for extended periods, has to lie down frequently[.] She has vision problems on and off, dizziness and lightheadedness. If she does push herself and do too much she is then in misery from it and finds it difficult to even get around at all, and has muscle weakness and numbness[.] Difficulty swallowing at times.

(Admin. R. at 327.)

Vanes described restrictions in daily living similar to those identified by Plaintiff in the Report, but additionally noted Plaintiff prepares meals only once a week, can perform only one household chore per day with frequent rest periods, rarely goes outside and only to get the mail, uses public transportation, texts and uses Facebook on her phone daily, and has difficulty lifting her legs to get in and out of a car and the shower. (Admin. R. at 328-32.) Vanes indicated

PAGE 6 - OPINION AND ORDER

Plaintiff's condition limited her ability to lift (Plaintiff had trouble lifting bleach bottles), squat,

bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate,

understand, follow instructions, and use her hands. (Admin. R. at 324.)

In early 2015, Vanes again provided her observations of Plaintiff's increased limitations.

(Admin. R. at 350.) Vanes stated Plaintiff:

> Still is unable to drive, extremities go numb, weak, and unresponsive, increased
> frequency in balance loss, chronic fatigue, insomnia, bladder problems, sensational
> changes caused burning finger w/ unawareness, no pain at the time although it
> blistered swallowing & breathing issues have worsened legs get numb getting into
> shower daily extremities feel very heavy extremity issues make writing difficult,
> along with other motor skills as in cutting things, cooking, leaning, shopping. Kyra
> goes with me to do her weekly shopping since she is unable to drive now, and she
> has to go sit down much more frequently, is unable to complete grocery shopping
> without breaks even though it will be under an hour. Even getting her legs to lift
> in and out of car has become increasingly difficult.

(Admin. R. at 350.) Vanes reiterated her opinion on Plaintiff's limitations in a four-page letter

dated November 16, 2016. (Admin. R. at 357-60.)

*C. Lee H.*

Plaintiff's father, Lee H. ("Lee"), authored a two-page letter dated November 23, 2016,

offering his impressions of Plaintiff's conditions and resulting limitations. (Admin. R. at 362-63.)

In the letter, Lee reported:

> With the weakness numbness and fatigue that cause Kyra issues she does not drive
> herself any further than a small convenient store just down the street from her house
> on a rural road. She does not feel she can safely drive herself into town, right now.
> Because of this I will drive her into town to run errands and do grocery shopping.
> Kyra wears sunglasses anywhere there are bright lights due to light sensitivity. She
> will try to not wear them but if she is squinting too much or her eyes start to ache
> she will put them back on. I have witnessed her start out ok during these trips and
> then wear out fast. I have seen her have issues getting in and out of cars, often
> having to lift her leg with her hand to get it in the car. She is noticeably slower
> moving than she used to be. She has noticeable pain and stiffness issues. I have
> seen her have balance and dizziness issues. She has a hard time walking too much
> especially without something to lean on like a grocery cart, but even then it's easy

to tell that she is worn out after shopping and sometimes has to sit down in the middle of shopping or cut her trip short. I have seen her struggle to get up her stairs and have to use the hand rails to help pull herself up. Her left leg seems to be worse for weakness, as I have seen her shake as she puts her weight on that leg trying to get up the stairs. I have seen her have stiffness, pain and balance issues getting out of chairs and also from standing too long, like from cooking dinner. She falls because of the weakness and numbness in her legs hips and back. I was there for the aftermath of one of her falls, meeting her at the ER after an ambulance brought her in. She ended up, thankfully, with just a sprained ankle that time. She has noticeable loss of strength in her arms, she had 5 gallon water bottles but has changed them out for 3 gallon ones and even then has to handle them with both hands, and is unable to carry them any more than a few feet.

I have seen her extremely fatigued and feeling worn out/sick. I have seen her wrapped in a blanket with it being warm in her house. When she is feeling this way she has a hard time having and following conversations. I have witnessed her stop suddenly mid[-]sentence and you can see the frustration on her face as she struggles to find the right word to finish her sentence. She has noticeable memory issues. I have seen her struggle to stay awake even during conversations. On one of our outings she mentioned she was getting tired, but we wanted to stop for lunch at a fast food restaurant where she had a hard time operating a soda machine she has successfully operated several times before.

During my visits with her in her home I have noticed dishes not done, counters not wiped down, vacuuming obviously not done, yard work not done, which for a lot of people is not a really big deal, but for my daughter ... that's pretty big. She likes her house clean and her yard kept up.

(Admin. R. at 362-63.)

II. Medical Evidence

    *A. Medical Providers*

        1. Duke

Plaintiff began treatment with Duke on June 5, 2013, immediately after her lifting incident. Plaintiff reported back pain and numbness, right leg weakness, and left leg numbness. (Admin. R. at 449.) Duke indicated Plaintiff did not have diffuse or other pain in her joints, generalized muscle aches, joint swelling or stiffness, or back spasms, but she refused to walk due to her reported numbness. (Admin. R. at 450.) Duke observed normal bilateral muscle strength and tone in

PAGE 8 - OPINION AND ORDER

Plaintiff's EHL,[4] flex[o]rs, extenders, everters, inverters, and quads, diagnosed a lumber and thoracic sprain with lumbar radiculopathy, and prescribed a muscle relaxant, Ibuprofen, and physical therapy. (Admin. R. at 450.)

A week later, Plaintiff reported her pain continued in her back but had improved about eight percent and her right leg was now numb but no longer weak. (Admin. R. at 447.) Duke indicated Plaintiff's gait was abnormal, she rose very tentatively from the chair, had difficulty toe-and-heal walking, and some weakness with resistance on extension of the left lower leg and flexion of the right lower leg. (Admin. R. at 448.) On June 18, 2013, Plaintiff represented her pain had not improved and was constant, but Duke reported Plaintiff had a normal gait and station while moving slowly, and normal strength in her lower body with the exception of a slight decrease when extending the left leg. (Admin. R. at 446.)

By July 2, 2013, Plaintiff noted she had improved twenty percent and Duke observed Plaintiff rose slowly from the chair but had a normal gait and station, normal bilateral lower body strength, and range of motion between twenty and thirty degrees in her back. (Admin. R. at 444.) Duke again recommended physical therapy and released Plaintiff to return to light-duty work with no bending, crawling, twisting or climbing of ladders, or lifting of more than ten pounds; occasional squatting, walking on ramps or rough surfaces, use of stairs or steps, or use of arms to push, pull, grab, lift, or carry; frequent reaching; the ability to change position at will and lay down on occasion; a fifteen minute limit on standing and walking; and no limit on sitting. (Admin. R. at 444, 495.)

---

[4] "EHL" refers to "Extensor Hallucis Longus" which is "a long thin muscle situated on the shin that extends the big toe and dorsiflexes and supinates the foot." MERRIAM WEBSTER DICTIONARY, https://www.merriam-webster.com/medical/extensor%20hallucis%20longus.

2.  Dr. Bert

Jeffrey K. Bert, M.D. ("Dr. Bert"), treated Plaintiff from August 2013 to May 2014.  In August 2013, Duke referred Plaintiff to Dr. Bert for evaluation of her back pain.  (Admin. R. at 410.)  Plaintiff denied any history of back injuries or treatment and reported she was struggling with the sitting requirements of her light-duty work.  (Admin. R. at 410.)  Dr. Bert observed palpable spasms and restricted flexion in her back; normal strength in her hip flexors, quads, hamstrings, tibialis anterior, EHL, and foot plantars and everters; and a positive straight leg raise bilaterally at seventy-five degrees.  (Admin. R. at 411.)  Dr. Bert recommended Plaintiff continue with her anti-inflammatory and muscle relaxant prescriptions and initiate physical therapy, and excused Plaintiff from work for six weeks to maximize her healing.  (Admin. R. at 411.)  In October 2013, Plaintiff reported slight improvement with therapy but had severe limitations in back flexes, side bends, and extension, positive straight leg raising bilaterally, and low-back tenderness.  (Admin. R. at 406.)  Dr. Bert sought authorization to perform steroid injections at L4-5 and L5-S1.  (Admin. R. at 406.)  By the end of the year, Plaintiff's straight leg raises were positive on the right only, her reflexes were normal, and she had no gross impairment.  (Admin. R. at 404.)

Dr. Bert again recommended the initiation of steroid injections in March 2014 and advised against Plaintiff traveling to Portland, Oregon, for an independent medical exam, because Plaintiff reported that sitting for more than an hour caused "a great deal of discomfort."  (Admin. R. at 402.)  At this time, Plaintiff exhibited a positive straight-leg raise bilaterally.  (Admin. R. at 402.)  As of May 2014, Dr. Bert's request for authorization to perform steroid injections had not been approved.  (Admin. R. at 401.)  On May 29, 2014, Dr. Bert concurred in an assessment offered in Plaintiff's workers' compensation claim that provided:

PAGE 10 - OPINION AND ORDER

You indicated in your response to the IME that the accepted thoracic and lumbar strains have resolved. From previous conversations with you, I understand that you will give strains approximately 90 days. [Plaintiff's] injury was on June 5, 2013.

With the above in mind, would you agree that the accepted thoracic and lumbar strains were medically stationary without permanent impairment or work restrictions when you saw [Plaintiff] on December 30, 2013.

(Admin. R. at 493-94.)

## C. Dr. Frederick

On March 10, 2015, Plaintiff consulted with neurologist intern Meredith C. Frederick, M.D. ("Dr. Frederick"), who, after questioning and examining Plaintiff, commented "[t]he intermittent nature of her symptoms is certainly unusual." (Admin. R. at 584.) Dr. Frederick observed Plaintiff's motor tone was normal in all groups and that while Plaintiff exhibited giveaway weakness, she could obtain 5/5 when encouraged. (Admin. R. at 583.) She had a decrease in sensation to light touch, pinprick, vibration, and temperature on her right side, and her fine finger, heel tapping and rapid alternative movements, and finger to nose were of normal speed and fluency. (Admin. R. at 583.) Dr. Frederick noted Plaintiff's casual gait appeared antalgic, which Plaintiff attributed to weakness rather than pain, and Plaintiff was able to steady herself when needed, could heel walk, and could stand, but not easily walk, on her toes. (Admin. R. at 583.) However, Dr. Frederick stated Plaintiff's "gait was improved later when she was leaving the clinic compared to during gait exam." (Admin. R. at 583.) Similarly, Dr. Frederick indicated Plaintiff rose "very slowly from the chair without her arms, legs trembling, but able to maintain squat position while rising to stand." (Admin. R. at 583.) Dr. Frederick recommended an EMG to investigate Plaintiff's loss of sensation on her right side, noting all previous MRIs, x-rays, and punctures were unremarkable, and continued physical therapy to increase strength and mobility.

(Admin. R. at 584.)  Julie Khoury, M.D., a neurology professor, agreed with Dr. Frederick's diagnosis and documentation on March 26, 2015.  (Admin. R. at 585.)

Plaintiff returned to Dr. Frederick in June 2017 "for assistance with her ongoing symptoms." (Admin. R. at 926.) Dr. Frederick explained the results of the 2015 EMG "showed active denervation in the lumbar paraspinals bilaterally" with "[n]ormal lower extremities." (Admin. R. at 926.) Testing again revealed Plaintiff's motor tone was normal in all groups and that while Plaintiff exhibited giveaway weakness, she could obtain 5/5 when encouraged. (Admin. R. at 929.) Plaintiff had decreased sensation to temperature in the left foot with "intact and symmetric vibration everywhere," finger to nose was of normal speed with no action tremor or end-point dysmetria, and "heel to shin [was] difficult and slow, but without obvious ataxia." (Admin. R. at 929-30.) Dr. Frederick reported Plaintiff was "[s]low to rise from a chair, appears antalgic. Gait is narrow base and slowed." (Admin. R. at 930.) Dr. Frederick opined Plaintiff's "symptoms and exam are consistent with a functional neurologic symptom disorder with mixed symptoms" which is supported by Plaintiff's "inability to look down when this is directly tested, but other times her extraocular movements are normal" and "loss vibration on the right side of the frontal bone, but not on the left." (Admin. R. at 930.) Dr. Frederick also commented: "In general her neurologic exam is very reassuring with intact strength." (Admin. R. at 930.)

D.  Dr. Gerber

Robert Gerber, M.D. ("Dr. Gerber"), identified by Plaintiff as her treating physician, noted at various times from August 2015 to April 2016 that Plaintiff suffered from fibromyalgia, obesity, depressive order, chronic fatigue and malaise, chronic arthralgias of the knees and hips, generalized muscle weakness and unspecified joint, pelvic, thigh and extremity pain, disturbance of skin sensation, and insomnia. (Admin. R. at 733, 740, 749, 751, 753.) Plaintiff regularly

PAGE 12 - OPINION AND ORDER

complained of chronic back, hip, and knee pain and weakness during her visits with Dr. Gerber but he rarely, if ever, commented on Plaintiff's physical limitations or test results relating to her physical limitations in his examination notes. (Admin. R. at 731, 739, 747, 753.)

On December 7, 2016, Dr. Gerber completed a medical evaluation addressing Plaintiff's physical limitations. (Admin. R. at 826-30.) Dr. Gerber represented he had been treating Plaintiff since October 2015, diagnosed her with "Chronic Fatigue Syndrome, Central Nervous System Disorder, Lumbago, Cervicalgia, Chronic joint pain, Sensation disorder, muscle weakness, numbness, and tremors" which were treated with "multiple referrals to outside providers including neurology, orthopedics, rheumatology, ENT, physical therapy" and "multiple pharmaceutical interventions attempted with very little relief and increased medication sensitivity." (Admin. R. at 826, 828.) Dr. Gerber stated "most days [Plaintiff] can only tolerate less than one hour of activity before significant rest period is necessary," must lie down or rest "many" times per day, and is able to sit for twenty minute intervals for a total of one hour in an eight-hour work day and stand or and walk for five minute intervals for a total of one hour in an eight-hour work day. (Admin. R. at 826-27.) He indicated Plaintiff requires the opportunity to shift positions at will, take "constant" unscheduled breaks during the workday, and periodically elevate her legs. (Admin. R. at 826-29.) Dr. Gerber opined Plaintiff is limited to occasional lifting of less than ten pounds; is able to grasp, turn, and twist objects with her hands and reach with her arms for five percent of a workday; is unable to engage in fine manipulation with her fingers; and would miss more than four days of work per month. (Admin. R. at 829-30.)

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

PAGE 13 - OPINION AND ORDER

B. *Examining Physicians*

1. Dr. Toal

On April 21, 2014, orthopedic surgeon and independent medical examiner Thomas Toal, M.D. ("Dr. Toal"), reviewed the various reports and medical records, and examined Plaintiff for the purpose of determining the compensability of Plaintiff's condition after the June 2013 injury. (Admin. R. at 981.) Dr. Toal observed Plaintiff transitioned slowly from sitting to standing and from sitting to the supine position, and walked slowly with an antalgic gait. (Admin. R. at 990.) Plaintiff complained of pain at a level of eight to ten on a one-to-ten scale, with compression of the cranial vertex and rotation of the pelvis and lumbar spine. (Admin. R. at 990.) Dr. Toal reported Plaintiff "well-tolerated" several straight leg raises to ninety percent without complaints of pain while sitting on both sides; suffered severe back pain with hip flexion from forty to fifty percent from supine position on the left and right side, respectively; exhibited normal strength in hip and knee flexion and extension and lower extremity abduction and adduction; and had no evidence of lower extremity atrophy. (Admin. R. at 990.) He noted the results of the "extensive validity testing" performed "indicate conscious embellishment of symptoms. Pain was stated to be present in response to maneuvers that should not elicit pain, even in the setting of severe spondylosis." (Admin. R. at 993.) Dr. Toal commented:

> [g]enerally the claimant's complaints of pain are out of proportion to objective findings on physical examination, and her complaints of lower extremity pain, weakness, and numbness are not borne out by the generally benign appearance of her magnetic resonance imaging study. The stated worsening of her condition is not consistent with normal healing after an injury. . . . It is an odd coincidence that the claimant sustained a disabling work injury (after nine years of employment) on the day when she was scheduled to have a disciplinary hearing.

(Admin. R. at 992.)  Dr. Toal found Plaintiff to be stationary because the conditions resulting from the June 2013 lifting incident had resolved and believed Plaintiff was "capable of performing regular work.  (Admin. R. at 995.)

### 2.  Dr. Farwell

Jacqueline Farwell, M.D. ("Dr. Farwell"), reviewed Plaintiff's medical records and on January 15, 2015, diagnosed Plaintiff with discogenic and degenerative disorders of the back and anxiety disorders but did not consider Plaintiff disabled.  (Admin. R. at 115.)  Dr. Farwell believed Plaintiff retained the ability to push and/or pull; occasionally lift or carry twenty pounds, climb ladders, ropes or scaffolds, stoop, or crouch; frequently lift or carry ten pounds, climb ramps and stairs, balance, kneel, or crawl; and stand and/or walk and sit about six hours in an eight-hour workday.  (Admin. R. at 125-26.)  Accordingly, Dr. Farwell found Plaintiff able to engage in light, unskilled work.  (Admin. R. at 129-30.)

### 3. Dr. Alvord

Scott R. Alvord, Psy.D. ("Dr. Alvord"), evaluated Plaintiff on April 12, 2017, and diagnosed Plaintiff with moderate, chronic post-traumatic stress disorder, a depressive disorder, a somatic symptom disorder, a mild neurocognitive disorder, and a general personality disorder. (Admin. R. at 884-85.)  Dr. Alvord indicated Plaintiff's "[p]sychmotor movements are significant for globally slow ambulation judged secondary to obesity."  (Admin. R. at 883.)  After performing additional testing, Dr. Alvord eliminated the neurocognitive diagnoses.  (Admin. R. at 975.)

### C.  Images and Testing

#### 1.  2013

Images of Plaintiff's spine taken within a week after her lifting incident were relatively normal.  With regard to her thoracic spine, x-rays revealed:  "The osseous structures are intact

PAGE 15 - OPINION AND ORDER

without acute osseous traumatic injury or vertebral body height lost. Multi-level disc spondylosis is seen with anterior hypertrophic osteophyte formation. No anterolisthesis or retrolisthesis is seen. No paraspinal soft tissue abnormalities are noted. The visualized cardiomediastinal structures are normal." (Admin. R. at 460.) With regard to her lumbosacral spine, x-rays revealed: "The osseous structures demonstrate preserved vertebral body height. There is mild disc spondylosis with marginal hypertrophic osteophyte formatted noted. No anterolistheses or retrolistheses is seen. The sacroiliac joints are stable." (Admin. R. at 459.) An MRI of Plaintiff's lumbar spine showed: "Posterior annular tear at the levels of L4-5 and L5-S1 with associated small central and paracentral right disc protrusions resulting in mild central canal stenosis without foraminal compromise." (Admin. R. at 456.)

       2. 2014

X-rays of Plaintiff's cervical spine taken on June 12, 2014, revealed: "The posterior alignment is normal. There is no evidence of subluxation with flexion and extension views. Minimal anterior osteophytic changes are seen at C5-6. The atlantoaxial relationship is normal." (Admin. R. at 458.) A July 2014 MRI of the same area indicated: "No evidence of neural compressive abnormality in the cervical spine. No foraminal compromise. Normal cord signal." (Admin. R. at 531.)

After Plaintiff fell in November 2014 and allegedly injured her lower back and left hip, x-rays of Plaintiff's pelvis and left hip revealed "No acute osseous traumatic injury or abnormal alignment of the left hip," and of her lumbosacral spine revealed "Disc spondylosis without vertebral body height loss or abnormal alignment. Flexion and extension views demonstrate no evidence for abnormal alignment or motility." (Admin. R. at 567-68.)

\ \ \ \ \

PAGE 16 - OPINION AND ORDER

### 3. 2015

X-rays of Plaintiff's lumbar spine from February 2015 showed "mild multilevel degeneration with small disc bulges at multiple levels," particularly at L5-S1, and "[a]nnular fissures at L5-S1 and L4-L5." (Admin. R. at 695.) Various nerve conduction studies and an EMG performed in April and May 2015 were mostly within normal limits. (Admin. R. at 646-47, 655-66.) Testing of Plaintiff's upper extremities revealed findings consistent with "a right sensory median nerve neuropathy suggestive of a very mild right carpal tunnel syndrome," while the results for the lower extremities were "suggestive of lumbar radiculopathy bilaterally" at L4-5 and L5-S1 with no abnormal findings in "other muscles tested in the bilateral lower extremities" or "in the nerve conduction study portion of the examination in the lower extremities." (Admin. R. at 647, 656.) In November 2015, Plaintiff had another round of hip, pelvis, and lumber spine x-rays which revealed "mild degenerative joint disease in the bilateral hips" and "degenerative disc disease, mild at L5-S1 and minimal elsewhere in the lumbar spine." (Admin. R. at 682-85.)

### 4. 2016

X-rays of Plaintiff's lumbar spine taken in June 2016 revealed "normal sacroiliac joints with good alignment of the spine. No lytic or blastic defects. Multilevel degenerative changes in the disc space is appreciated with spur formation. No other anomalies are noted." (Admin. R. at 668.)

### D. Other Medical Notes

Various medical providers commented on Plaintiff's ability to move relatively normally despite her conditions. Additionally, testing of Plaintiff's strength, sensation, and movement during the relevant period revealed both deficient and normal findings.

\ \ \ \ \

PAGE 17 - OPINION AND ORDER

### 1. Holmes

In November 2013, Plaintiff visited Cynthia L. Holmes, PA-C ("Holmes"), to discuss thyroid medication. (Admin. R. at 434.) Holmes indicated Plaintiff "[m]oves easily from chair to exam table and back." (Admin. R. at 434.)

### 2. Villareal

On April 14, 2014, Jason Villareal, D.P.T., A.T.C. ("Villareal"), noted Plaintiff exhibited "very poor mechanics in bed mobility and supine to sit transfers," "poor body awareness, limited core stability and pain," and "limited strength bilaterally due to tightness of hip flexors and gastrocs," but her straight leg raise test was negative. (Admin. R. at 398.) Villareal recommended "[m]anual therapy . . . coupled with flexibility therapeutic exercises to improve body mechanics, improve core stability in order to return to pain-free function." (Admin. R. at 399.)

### 3. Tokich

In May 2014, Pauletta Tokich, A.R.N.P. ("Tokich") observed Plaintiff "displays no tremor and [has] normal reflexes. She exhibits normal muscle tone. Coordination abnormal. Gait normal." (Admin. R. at 419.) From August 2014 to December 2014, Tokich repeatedly observed Plaintiff had "Normal range of motion. Walks in an upright manner, gait is smooth and comfortable, no limp or altered movements, no obvious sign of discomfort." (Admin. R. at 504, 551, 554, 575.) In October, November, and December 2014, Tokich also noted Plaintiff exhibited normal strength, reflexes, muscle tone, coordination, and gait. (Admin. R. at 551, 554, 575.) However, in January 2015, Tokich indicated Plaintiff was unable to lift her left leg onto the exam table, displayed a decreased range of motion in her lumbar back with tenderness, as well as abnormal coordination, muscle tone, and gait, and mild tremor but no atrophy. (Admin. R. at 777.)

\ \ \ \ \

PAGE 18 - OPINION AND ORDER

#### 4. Dr. Cheung

On June 12, 2014, Lance Cheung, M.D. ("Dr. Cheung"), observed Plaintiff had limitations and pain with forward flexion and extension and some EHL breakaway weakness on the left, but normal and symmetric strength with hip flexion, knee extension, ankle dorsiflexion, plantar flexion and negative straight leg raise, which findings he substantially reiterated in July and October 2014. (Admin. R. at 454, 524, 562.)  In April and May 2015, Dr. Cheung reported marked improvement in Plaintiff's forward flexion but continued limitations and pain in extension, normal and symmetric strength in her lower extremities, and negative straight leg raise.  (Admin. R. at 646, 651.)

#### 5. Dr. Stoll

In July 2014, Michael Stoll, M.D. ("Dr. Stoll") reported Plaintiff exhibited tremors, abnormal reflex and muscle tone, and a weak right leg.  (Admin. R. at 468.)  However, he observed her coordination was normal and her gait steady.  (Admin. R. at 468.)

#### 6. Dr. Curcin

Aleksander Curcin, M.D. ("Dr. Curcin"), examined Plaintiff in mid-April 2015.  (Admin. R. at 397.)  In his notes, he indicated Plaintiff was "able to walk independently full weightbearing on bilateral lower extremities not demonstrating any gross neurological deficits."  (Admin. R. at 397.)

#### 7. Dr. Blanken

In October 2015, Celeste Blanken, D.O. ("Dr. Blanken") noted Plaintiff "sits slightly flexed," used her arms to raise from the chair and get on the table, and had an abnormal gait, but she exhibited normal muscle tone and no atrophy.  (Admin. R. at 744.)  In December 2015, Dr.

Blanken indicated Plaintiff had full range of motion with discomfort, normal strength and muscle, and no atrophy or sensory deficit.  (Admin. R. at 737.)

### 8.  Dr. Johnson

On June 27, 2016, Wesley Johnson, M.D. ("Dr. Johnson"), a "spine surgeon," examined Plaintiff and observed she moved slowly and had difficulty getting out of a chair and stepping up eight inches secondary to weakness.  (Admin. R. at 668.)  He also noted Plaintiff looked "pretty well muscle[d]," with lower extremity strength generalized at 4/5 and negative straight leg raising and bowstring sign.  (Admin. R. at 668.)

### 9.  Purdom

In August 2016, Peri Purdom D.N.P. ("Purdom"), indicated Plaintiff displayed abnormal muscle tone, coordination, and gait and tremor but had normal strength and exhibited no atrophy or sensory deficit.  (Admin. R. at 717.)  The following month, Purdom's observations were substantially similar but Plaintiff no longer exhibited tremor.  (Admin. R. at 706.)  From December 2016 to July 2017, Purdom noted Plaintiff had abnormal muscle tone, coordination and gait, severe imbalance and weakness associated with tremors and dizziness, and walked with a limp due to pain, but displayed normal strength and no atrophy, tremor, or sensory deficit, and commented, at least once, that "there is still no organic explanation for her multiple somatic complaints."  (Admin. R. at 906, 913, 914 918, 963, 971.)  But despite his consistent findings, Purdom signed Plaintiff's application for a non-wheelchair disabled parking permit in January 2017, apparently based on Plaintiff's representation she had not been able to walk more than two blocks due to muscle weakness for two-to-three years.  (Admin. R. at 365, 917.)

\ \ \ \ \

\ \ \ \ \

PAGE 20 - OPINION AND ORDER

10. Solomon

In mid-September 2016, Julie C. Solomon, A.R.N.P.-c, M.S.N., M.P.H. ("Solomon"), reported inconsistencies in prior examinations, "such as gait improvement when leaving facility and maintaining squat position while at the same time having difficulty rising from a chair" and observed Plaintiff exhibited a normal gait. (Admin. R. at 709, 711.) Solomon also noted Plaintiff "says she does not think she has fibromyalgia because she does not have significant chronic pain and she has a variety of other symptoms." (Admin. R. at 709.) Finally, Solomon twice acknowledged Plaintiff's "Secondary gain potential: applying for disability," and suggested a "Probable somatic component to her symptoms." (Admin. R. at 709, 712.)

11. Emergency Room

In December 2016, Plaintiff's counselor sent an ambulance to Plaintiff's residence when Plaintiff sent texts to the counselor implying she intended to injure herself.[5] (Admin. R. at 832, 835.) Emergency room chart notes reported injuries to Plaintiff's hand from punching a headboard indicated Plaintiff's "strength and sensation to light touch is grossly intact," and documented that she had a "normal gait." (Admin. R. at 835.)

III. Vocational Evidence

Francene Geers, a certified vocational rehabilitation counselor ("Geers"), participated in the Hearing and testified as a vocational expert. She characterized Plaintiff's last work experience to be a combination of domestic violence counselor, central supply worker, and receptionist with work demands in the sedentary, medium, or heavy range. (Admin. R. at 90, 371.) The ALJ asked

---

[5] Plaintiff reported she "drinks alcohol pretty much daily" and she "had some three 12[-]ounce beers which she says is pretty normal for her but she did not eat today." (Admin. R. at 834.)

Hunt if an individual could perform Plaintiff's past relevant work when the individual has these restrictions: limited to light work; frequent balancing, kneeling, crawling and climbing of ramps and stairs; occasional stooping, crouching, climbing of ladders and scaffolds, and interaction with supervisors, coworkers, and the public; no exposure to hazards, such as unprotected heights and moving mechanical parts; simple, routine, repetitive tasks requiring little change on a day-to-day basis, consistent with a reasoning level of two and unskilled work as defined by the Dictionary of Occupational Titles; and who requires an occupation where goals are set by others with no independent planning. (Admin. R. at 90-91.) Geers testified such an individual would be unable to perform Plaintiff's past relevant work, but could perform the jobs of photocopying machine operator, collator operator, and marker, all of which were classified as light, unskilled work. (Admin. R. at 91.) When the ALJ added the additional limitations of sedentary work, one hour of sitting and one hour of standing or walking in an eight-hour day with standing and walking limited to five minutes at a time, no fingering and reaching only five percent of the workday, and the ability to change position and elevate her legs at will, take a ten minute break during the two-hour workday, and be absent from work one out of five days per week, Geers opined there was no work available for such an individual. (Admin. R. at 92-93.) In a response to a question from Plaintiff's representative, Geers testified that an individual who needed to change position every fifteen minutes would not able to perform the tasks required of a photocopying machine operator, collator operator, or marker. (Admin. R. at 94.)

IV.  ALJ Decision

The ALJ found Plaintiff suffered from the severe impairments of degenerative disc disease of the cervical, thoracic, and lumbar spine; obesity; dysthymia with current major depression; generalized anxiety disorder; panic disorder with agoraphobia; post-traumatic stress disorder

PAGE 22 - OPINION AND ORDER

(PTSD) mild to moderate; general personality disorder; somatic symptom disorder; and functional neurological symptom disorder, and that Plaintiff had not engaged in substantial gainful activity since June 5, 2013. (Admin. R. at 17.) While conceding Plaintiff's impairments significantly limited her ability to perform basic work activities, the ALJ found such impairments did not meet or equal the severity of any listed impairment. (Admin. R. at 18. 19.) As a result of her impairments, the ALJ considered Plaintiff capable of performing light work with the following limitations:

> the claimant is limited to frequent climbing of ramps and stairs and occasional climbing of ladders and scaffolds. She is limited to frequent balancing, kneeling, and crawling. She is limited to occasional stooping and crouching. The claimant is limited to simple routine repetitive tasks, requiring little change on a day-to-day bases, consistent with a reasoning level of two and unskilled work as defined by the Dictionary of Occupational Titles. She requires occupations where goals are set by others and where no independent planning is required. The claimant is limited to occasional interaction with supervisors, coworkers, and the public. She is limited to no exposure to hazards such as unprotected heights and moving mechanical parts.

(Admin. R. at 21.) In light of these limitations, the ALJ deemed Plaintiff unable to perform her past relevant work of family case worker, domestic violence counselor, and central supply worker. (Admin. R. at 27.) The ALJ acknowledged the vocational expert's testimony that a person with these limitations could perform the jobs of photocopy machine operator, collator operator, and marker. (Admin. R. at 28.) Consequently, the ALJ found Plaintiff "has not been under a disability, as defined in the [Act], from June 5, 2013, through the date of this decision." (Admin. R. at 29.)

The ALJ found the impairments Plaintiff suffered reasonably could be expected to result in some symptoms and corresponding limitations, but found Plaintiff's testimony regarding the intensity, persistence, and limiting effects of the symptoms to be not entirely consistent with the

evidence, medical or otherwise, found in the record. (Admin. R. at 22.) In summarizing Plaintiff's

testimony of her symptoms and resulting limitations, the ALJ noted Plaintiff:

> testified she had 12 or 13 days a month when she had leg problems. She indicated
> that she had leg weakness and numbness that was intermittent and last about half a
> day. The claimant reported she was unable to sit, stand, or walk for long periods
> of time. She indicated if she tried to "push things", she would fall, so she goes and
> lies down. She said these symptoms sometimes occurred in her arms as well. She
> reported she had pain, stiffness, and numbness in her back. She stated she had
> problems with balance, tremors, and extreme fatigue. The claimant indicated she
> had concentration, understanding, and focus issues. She testified she was only able
> to drive short distances.

(Admin. R. at 22 (internal citations omitted).) The ALJ then identified medical evidence, clinical

findings, and reported activities of daily living that contradicted, or were not entirely consistent,

with Plaintiff's reported limitations.

With regard to limitations resulting from degenerative disc disease, the ALJ acknowledged

images of Plaintiff spine revealed "minimal anterior osteopathic changes at C5-6," "multi-level

disc spondylosis with acute osseous traumatic injury or abnormal alignment of the thoracic spine,"

"mild multilevel degeneration with small disc bulges at multiple levels, and abutment of the exiting

right nerve roots at L5-S1," and "annular fissures at L5-S1 and L4-L5," but noted resulting

limitations observed by medical providers were inconsistent. (Admin. R. at 22.) For example,

while some treatment notes revealed claimant had loss of strength, decrease in sensation, and

positive straight leg raising, most notes described these findings as normal or negative. (Admin.

R. at 22.) Various treatment notes indicated Plaintiff was able to walk independently,

demonstrated no gross neurological deficits, had intact sensation to pinprick, light touch, vibration,

and proprioception in her upper extremities, and a normal EMG study of her lower limbs. (Admin.

R. at 22.) Additionally, the ALJ noted orthopedic surgeon Dr. Johnson examined Plaintiff but

recommended only conservative treatment for her back pain. (Admin. R. at 22.)

PAGE 24 - OPINION AND ORDER

The ALJ also noted a few statements from medical professionals questioning the accuracy of Plaintiff's reported symptoms and limitations.  Specifically, the ALJ explained Dr. Frederick" characterized the intermittent nature of the claimant's symptoms as "unusual" and identified inconsistencies in her examination of Plaintiff, such as an improvement in Plaintiff's gait when she was leaving the facility, Plaintiff's ability to maintain a squat position while exhibiting difficulty rising from a chair, and Plaintiff's initial breakaway weakness compared to her ability to exhibit full strength with encouragement.  (Admin. R. at 22-23.)  Neurologist Anton Lotman, M.D. ("Dr. Lotman") "observed the claimant had mild give-way weakness with evaluation of her upper and lower extremities that was not consistent with his exam" and reported Plaintiff's inability to look down during testing was inconsistent with her ability to look down at other times, such as when she was tying her shoes.  (Admin. R. at 23.)  The ALJ relied on a summary by Dr. Toal of "a number of concerns" expressed by Duke in late October 2013 in a response to an "interrogatory style letter."[6]  (Admin. R. at 23, 988.)  According to Dr. Toal, Duke explained

> [Plaintiff's] symptoms and complaints seem far in excess of her clinical presentation and seemed out of proportion to the nature of her alleged injury.  On June 5th, no back muscle spasms were identified, no joint pain, no swelling or stiffness or generalized muscle aches.  No objective findings were documented, and she would have expected some.  The claimant also began asking questions about obtaining disability shortly after initiating treatment.  These factors made it difficult to determine the validity of her symptoms and injury.  She complained of leg weakness and difficulty walking; however, her muscle strength was normal. [Plaintiff's] alleged symptoms and complaints were not explained by magnetic resonance imaging findings.

(Admin. R. at 23, 988.)  Dr. Toal explained in his report he had completed extensive validity testing during which Plaintiff reported pain while doing maneuvers which should not have elicited pain,

---

[6] Neither party nor the ALJ cited to Duke's October 2013 letter and the court was unable to find the letter in the administrative record.  It appears this letter was part of the workers' compensation dispute and not offered in the Social Security proceedings.

leading to the conclusion Plaintiff had "consciously embellished her symptoms." (Admin. R. at 23.) Similarly, in January 2017, Purdom commented "there was still no organic explanation for the claimant's multiple somatic complaints." (Admin. R. at 23.)

Finally, the ALJ relied on Plaintiff's reported activities of daily living to justify discounting Plaintiff's testimony and ultimately finding Plaintiff is not disabled. (Admin. R. at 24.) The ALJ noted Plaintiff:

> shops once a week at Walmart. She is able to shop for groceries and prepare simple meals. She does household chores including washing dishes, doing laundry, and vacuuming. She has alleged problems with focus and concentration, but testified that she plays video games on her computer, which shows that she is able to focus on some things. She uses Facebook. She manages her own finances. The claimant felt well enough in November 2015 to prepare a full Thanksgiving meal for her family. These activities are not what one would expect from a disabled individual.

(Admin. R. at 24-25 (internal citations omitted).)

The ALJ gave little weight to the opinion proffered by Dr. Gerber on Plaintiff's functional limitations, finding it inconsistent with the medical record and based heavily on Plaintiff's self-reported symptoms and limitations. (Admin. R. at 25.) Similarly, the ALJ rejected, in large part, the testimony from Vanes and Plaintiff's father describing Plaintiff's limitations because they mirror Plaintiff's subjective complaints, which are inconsistent with objective medical evidence. (Admin. R. at 27.)

### Standard of Review

The Act provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2019). In addition, SSI may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a) (2019). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.),

PAGE 26 - OPINION AND ORDER

*cert. denied*, 519 U.S. 881 (1996) (DIB); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992) (SSI). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (2019). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A) and 1382c(a)(3)(B) (2019).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI because he or she is disabled. 20 C.F.R. §§ 404.1520 and 416.920 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments,

PAGE 27 - OPINION AND ORDER

the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed

to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment

prevents the claimant from performing work which the claimant has performed in the past.  If the

claimant is able to perform work which he or she has performed in the past, a finding of "not

disabled" is made and Benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to

the fifth and final step to determine if the claimant can perform other work in the national economy

considering his or her age, education, and work experience.  The burden shifts to the Commissioner

to show what gainful work activities are within the claimant's capabilities.  *Distasio v. Shalala*, 47

F.3d 348, 349 (9th Cir. 1995) (DIB); *Drouin*, 966 F.2d at 1257 (SSI).  The claimant is entitled to

Benefits only if he or she is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and

416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the

Commissioner's decision is guided by the same standards.  42 U.S.C. §§ 405(g) and 1383(c)(3)

(2019).  The reviewing court must affirm the Commissioner's decision if the Commissioner

applied proper legal standards and the findings are supported by substantial evidence in the record.

42 U.S.C. § 405(g); *Batson* v. *Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir.

2004).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance."

*Robbins* v. *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d

1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner.

*Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  Thus, where

PAGE 28 - OPINION AND ORDER

the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (2019); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). The reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007). However, a reviewing court may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## Discussion

Plaintiff asserts the ALJ erred by improperly discounting Plaintiff's testimony with regard to her pain, fatigue, and resulting limitations; lay testimony supporting these limitations; and Dr. Gerber's description of Plaintiff's limitations. Plaintiff's arguments are based in large part on the ALJ's consideration, or alleged failure to consider, Plaintiff's somatic symptom disorder and functional neurological symptom disorder ("Symptom Disorders") when evaluating Plaintiff's

subjective testimony. The Commissioner contends the ALJ properly considered the evidence in accordance with the terms of the Act and related regulations, and the decision should be affirmed.

I. Plaintiff's Testimony

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis. _Trevizo v. Berryhill_, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019). The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. _Molina v. Astrue_, 674 F.3d 1104, 1112 (9th Cir. 2012); _Tommasetti v. Astrue_, 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. _Carmickle v. Comm'r Soc. Sec. Admin._, 533 F.3d 1155, 1160 (9th Cir. 2008); _Lingenfelter v. Astrue_, 504 F.3d 1028, 1036 (9th Cir. 2007). The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony. _Brown-Hunter v. Colvin_, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony. _Ghanim v. Colvin_, 763 F.3d 1154, 1163 (9th Cir. 2013); _Tommasetti_, 533 F.3d at 1039. "Credibility determinations are the province of the ALJ" and the court may not "second-guess" the ALJ's determination if they have made specific findings that are supported by substantial evidence in the record. _Fair v. Bowen_, 885 F.2d 597, 604 (9th Cir. 1989).

\ \ \ \ \

\ \ \ \ \

PAGE 30 - OPINION AND ORDER

The ALJ found Plaintiff produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. He also identified evidence which would support a finding Plaintiff was malingering.

*A. Malingering*

The Ninth Circuit appears to require evidence of malingering be identified by a medical source or other witness and contained in the record. *See Swenson v. Sullivan*, 876 F.2d 683, 688 (9th Cir. 1989) ("The ALJ found Swenson credible, and no doctor suggested that Swenson was malingering."); *see also Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984) ("No witness, qualified expert or otherwise, expressed the opinion that claimant was in any way malingering."); *Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998) ("Nowhere has the ALJ pointed to affirmative evidence of malingering."). Accordingly, someone other than the ALJ must provide an opinion that the claimant is malingering.

The ALJ expressly referenced Dr. Frederick's comment on the unusual intermittent nature of Plaintiff's symptoms, which comments were supported by contradictory test results, unremarkable x-ray and MRI results, and inconsistencies in the examination, such as the improvement in Plaintiff's gait as she left the building and her ability to maintain a squat position while having difficult rising from a chair. Similarly, the ALJ noted Dr. Lotman observed inconsistent give-way weakness in Plaintiff's extremities, which contradicted his exam findings, and Plaintiff's inability to look down when directly tested when compared to her ability to look down without difficulty during the remainder of the exam and when she tied her shoes. Duke identified various factors which made it difficult to determine the validity of Plaintiff's claims, such as the absence of objective findings, including no back muscle spasms, joint pain, swelling, stiffness, or generalized muscle aches; the generally benign appearance of Plaintiff MRI results;

PAGE 31 - OPINION AND ORDER

and Plaintiff's normal muscle strength in light of her complaints of leg weakness and difficulty walking. The ALJ specifically noted Duke "indicated the claimant's symptoms and complaints seemed far in excess of her clinical presentation and seemed out of out of proportion to the nature of her alleged injury," and commented "the claimant also began asking questions about obtaining disability shortly after initiating treatment." (Admin. R. at 23.) Dr. Toal performed, validity testing which he believed indicated Plaintiff was consciously embellishing her symptoms, such as reporting pain while engaged in movements which should not elicit pain even if she had severe lumbar issues. Dr. Toal also observed: "It was an odd coincidence that the claimant sustained a disabling work injury (after nine years of employment), on the day when she was scheduled to have a disciplinary hearing." (Admin. R. at 23, 992.) Finally, Purdom commented on the absence of an organic explanation for the claimant's multiple somatic complaints.

The ALJ has adequately identified evidence in the record from multiple medical sources, some of whom treated Plaintiff, to support a finding Plaintiff was malingering to some extent, and which sources provided a motivation for such malingering. Consequently, the ALJ need not provide clear and convincing reasons for discounting Plaintiff's subjective testimony. Under the less stringent standard, evidence of malingering identified by the ALJ is sufficient, standing alone, to justify the ALJ discounting of Plaintiff's testimony. *See Benton v. Barnhart*, 331 F.3d 1030, 1040-41 (9th Cir. 2003) (an ALJ can reject plaintiff's testimony either through evidence of malingering or expressing clear and convincing reasons for doing so). However, the ALJ also relied on Plaintiff's reports of her daily activities, and inconsistent medical observations and clinical findings, to support his decision to not entirely credit Plaintiff's testimony.

\ \ \ \ \

PAGE 32 - OPINION AND ORDER

### B. Daily Activities

The ALJ also found Plaintiff's description of her daily activities to be inconsistent with her testimony regarding her functional limitations. An ALJ may use a claimant's daily activities to reject her subjective symptom testimony on either of two grounds: (1) if the reported activities contradict the claimant's other testimony; or (2) if the activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ was justified in discrediting Plaintiff's subjective testimony on both grounds.

"[I]f a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." *Burch*, 400 F.3d at 681-82. In *Burch*, the ALJ partially rejected the claimant's pain testimony explaining the claimant's daily activities "suggest that she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances and those of her nephew." *Id.* at 681. The court found the explanation constituted specific findings sufficient to support the ALJ's credibility determination. *Id.* at 681-82. Here, the ALJ made similar findings, relying on Plaintiff's testimony she had little difficulty managing her personal care, prepared meals, did laundry and dishes, and went grocery shopping. (Admin. R. at 31.)

The ALJ found "[t]he claimant's reported activities are inconsistent with a finding of disability," noting Plaintiff shops once a week for groceries at Wal-Mart, prepares simple meals, washes dishes, does laundry, and vacuums, and, on one occasion, felt well enough to cook a Thanksgiving dinner for her family, albeit with some help from family members. (Admin. R. at 24.) He opined this is contradictory to Plaintiff's claims she is unable to stand, sit, or walk for long periods of time or push things; she has intermittent leg weakness and numbness for about half

PAGE 33 - OPINION AND ORDER

a day twelve-to-thirteen days a month, and occasional arm weakness and numbness; she has pain, stiffness, and numbness in her back and problems with balance, tremors, and extreme fatigue, and regularly falls and needs to lie down. With regard to her mental limitations, the ALJ observed that she plays video games, uses Facebook, and manages her own finances despite her claims she is had problems with concentration, understanding, and focus.

While some could view Plaintiff's reports of her daily living activities as somewhat consistent with the limitations she describes, the evidence also supports a finding to the contrary. The ALJ is responsible for determining credibility and where evidence exists to support the ALJ's finding, the court may not substitute its own judgment or second guess the ALJ. The court finds the ALJ properly discounted Plaintiff's testimony as inconsistent with her description of her activities of daily living.

*C. Inconsistent Medical Evidence*

The ALJ discounted Plaintiff's testimony based, in part, on medical evidence he considered inconsistent with the claimed severity of Plaintiff's limitations. As explained above, the ALJ may engage in ordinary techniques of assessing a witness's credibility "such as weighing inconsistent statements regarding symptoms by the claimant." *Smolen,* 80 F.3d 1284. Thus, it is not legally impermissible to give a claimant's testimony reduced weight because that testimony contradicts the objective medical evidence in the record. *Id.* However, the ALJ may not "make a negative credibility finding 'solely because' the claimant's symptom testimony 'is not substantiated affirmatively by objective medical evidence.'" *Stockwell v. Colvin,* No. 3:13–cv–01220–HZ, 2014 WL 6064446, at *3 (D. Or. Nov. 11, 2014).

The ALJ specifically referenced numerous notes in which a medical source observed Plaintiff walked with a normal gait; exhibited normal muscle tone, reflexes, and range of motion;

and did not demonstrate sensory deficits, all of which were inconsistent with Plaintiff's reported limitations. Moreover, the ALJ noted a study of Plaintiff's lower limbs was normal and an orthopedic surgeon recommended only conservative treatment for Plaintiff's back. Because Plaintiff's testimony regarding the severity of her symptoms is not supported by various medical records and clinical findings, the ALJ did not err in identifying inconsistent medical evidence as a reason for discounting Plaintiff's testimony.

### D. Symptom Disorders

Plaintiff argues the ALJ failed to consider her Symptom Disorders and, as a result, improperly discounted her limitations. The court agrees the ALJ, after finding Plaintiff suffered from Symptom Disorders, did not expressly address the Symptom Disorders when discussing Plaintiff's testimony. However, on this record such failure was harmless and does not require reversal of the ALJ's conclusion. *See Michaud v. Berryhill*, Civ. No. 6:16-cv-01593-MC, 2017 WL 4535977, *4 (D. Or. Oct. 11, 2017) *aff'd*, No. 17-35994, 2020 WL 1744156 (9th Cir. April 8, 2020) (ALJ's error in finding doctor not qualified to comment on pain resulting from somatic symptom disorder harmless in light of ALJ's otherwise fully accounting for the pain within the context of the record.)

Dr. Alvord, an examining physician, diagnosed Plaintiff with a somatic symptom disorder in April 2017. Two months later, Dr. Frederick found Plaintiff's symptoms and examination to be "consistent with a functional neurologic symptom disorder with mixed symptoms."[7] (Admin. R.

---

[7] Functional neurological symptom disorder, also referred to as conversion disorder, "is one form of a [somatic symptom] disorder – a psychiatric syndrome where the patient's symptoms suggest medical disease, but no demonstrable pathology accounts for the symptoms. Conversion disorder, in particular, is characterized by a loss of, or change in motor or sensory functioning resulting from psychological factors. The physical symptoms cannot be explained medically. Patients lack voluntary control of their symptoms." *Herring v. Veterans Admin.*, 76 F.3d 386, *1 n.1 (9th Cir.

at 930.) The mental disorder listings relied on by the Commissioner explain that somatic symptom

and related disorders are:

> characterized by physical symptoms or deficits that are not intentionally produced
> or feigned, and that, following clinical investigation, cannot be fully explained by
> a general medical condition, another mental disorder, the direct effects of a
> substance, or a culturally sanctioned behavior or experience. These disorders may
> also be characterized by a preoccupation with having or acquiring a serious medical
> condition that has not been identified or diagnosed. Symptoms and signs may
> include, but are not limited to, pain and other abnormalities of sensation,
> gastrointestinal symptoms, fatigue, a high level of anxiety about personal health
> status, abnormal motor movement, pseudoseizures, and pseudoneurological
> symptoms, such as blindness or deafness

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00B(6) (2018).

The Ninth Circuit found an ALJ erred when he discounted a claimant's reports of pain as

likely exaggerated due to a somatization disorder. *Carradine v. Barnhart*, 360 F.3d 751, 754 (9th

Cir. 2004). The Ninth Circuit reasoned the source of disabling pain, whether physical or

psychological, was of no consequence, stating:

> If pain is disabling, the fact that its source is purely psychological does not disentitle
> the applicant to benefits. Pain is always subjective in the sense of being
> experienced in the brain. The question whether the experience is more acute
> because of a psychiatric condition is different from the question whether the
> applicant is pretending to experience pain, or more pain than she actually feels. The
> pain is genuine in the first psychiatric case, though fabricated in the second.

*Id.* Accordingly, the absence of objective medical evidence to support the extent of a claimant's

pain and resulting limitations is not a proper reason for rejecting the claimant's testimony. *Id.* at

755. The Ninth Circuit found it improbable the claimant would have the undergone extreme pain-

management measures, which included "not only heavy doses of strong drugs such as Vicodin,

Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter

---

1996) (unpublished) (citing American Psychiatric Association, *Diagnostic and Statistical Manual
of Mental Disorders* 445 (4th ed. 1994)).

and a spinal cord stimulator," merely to strengthen her credibility and to support her request for disability benefits. *Id.*

Here, the ALJ did not rely solely on the absence of medical evidence supporting the extent of Plaintiff's pain and resulting limitations. Rather, the ALJ discounted Plaintiff's testimony based on her own reports of her capabilities despite the pain she was feeling; medical evidence in the form of normal strength, muscle tone, sensation, that belied Plaintiff's claims she was extremely limited as a result of her pain; and observations from doctors that Plaintiff was not entirely forthright with her reported limitations, such as a visible improvement in her ability to walk as she left the examination location, her ability to maintain a squat but exhibiting difficulty getting out of a chair, and improvement in various tests when encouraged.

The mere diagnosis of a symptom disorder does not prohibit an ALJ from considering the accuracy of a claimant's reported symptoms or the limitations resulting therefrom. To hold to the contrary would, in essence, require a finding of disability for every claimant suffering from a symptom disorder. Both the Ninth Circuit and this court have applied the regular factors for weighing a claimant's credibility in a case where the claimant was diagnosed with somatic symptom disorder and found the claimant's reported limitations were not entirely credible. *See Chaudry v Astrue*, 688 F.3d 661 (9th Cir. 2012); *Michaud*, 2017 WL 4535977; *but see M. v. Comm'r, Social Sec. Admin.*, No. 6:17-CV-02000-MC, 2019 WL 2267303 *3 (D. Or. May 28, 2019)(ALJ erred in relying on "lack of corroborating clinical evidence to reject a claimant's symptom testimony," after having accepted conversion disorder diagnosis and impliedly acknowledging claimant's limitations could be partly psychological in nature). Additionally, after diagnosing Plaintiff with a functional neurologic symptom disorder, Dr. Frederick herself noted Plaintiff's "neurologic exam is very reassuring with intact strength." (Admin. R. at 930.) Even

PAGE 37 - OPINION AND ORDER

assuming Plaintiff's reports of pain, whether originating from physical or mental conditions, are accurate, her own reports of daily activities and the medical providers' observations of her mobility and strength provide evidence Plaintiff is not as limited by her pain, whether physical or psychological, as she reports. The ALJ properly relied on this evidence in discounting Plaintiff's testimony regarding the limitations resulting from her reported pain.

## II. Lay Testimony

Plaintiff contends the ALJ erred when he rejected, in large part, the testimony of Vanes and Lee. The ALJ discounted the lay testimony to the extent it mirrored Plaintiff's testimony on her limitations and was inconsistent with medical evidence.

Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).[8] If the ALJ wishes to discount lay witness testimony, she must give reasons that are germane to the witness. *Id.*

The ALJ provided the requisite justification to discount Vanes's and Lee's testimony. The ALJ found the lay testimony to be inconsistent with medical evidence, which is an appropriate justification supported by the evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005)

---

[8] The court notes that for all claims filed on or after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c govern. The new regulations provide the ALJ is "not required to articulate how [they] considered evidence from nonmedical sources . . . ." 20 C.F.R. §§ 404.1520c(d) (2019), 416.920c(d). As such, the ALJ is no longer required to provide reasons germane to lay witnesses to reject their testimony. *Cf. Dodrill*, 12 F.3d at 918-19. In this case, Plaintiff filed her claim for benefits in May 2014, well before March 27, 2017. *See* 20 C.F.R. § 404.614 (defining when an application for benefits is considered filed). Thus, the court analyzes Plaintiff's claim under the old standard applicable to lay witness testimony.

PAGE 38 - OPINION AND ORDER

(It is appropriate to reject the testimony of a lay witness where it is inconsistent with medical evidence.) Furthermore, the ALJ identified the similarities between Plaintiff's testimony of her limitations and those provided by Vanes and Lee as a reason for discounting their testimony. The court has found the ALJ did not err in discounting Plaintiff's testimony and those reasons apply equally to the testimony of Vanes and Lee.

III.  Dr. Gerber

Finally, the ALJ afforded little weight to the extreme limitations identified by Dr. Gerber in his December 2016 evaluation, finding them inconsistent with the medical record and based heavily on Plaintiff's reports. The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant.[9] Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed an opinion based only on a review of the claimant's medical records. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001).

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas v.*

_____

[9] The court notes that for all claims filed on or after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c (not § 404.1527) govern. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c (2019). Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. *See* 20 C.F.R. § 404.1520c. In this case, Plaintiff filed her claim for benefits in May 2014, well before March 27, 2017. *See* 20 C.F.R. § 404.614 (defining when an application for benefits is considered filed). Thus, the court analyzes Plaintiff's claim utilizing § 404.1527 (providing the rules for evaluating opinion evidence for claims filed prior to March 27, 2017).

*Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An uncontradicted opinion may be rejected only for clear and convincing reasons. *Thomas*, 278 F.3d at 956-957.

The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996). It may constitute substantial evidence if it is consistent with other evidence in the record. *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989). Furthermore, an ALJ need not accept a physician's opinion that is brief, conclusory or inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216. Additionally, if a claimant is found not credible, an ALJ may appropriately disregard statements the claimant made to his physicians. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

Plaintiff identifies Dr. Gerber as a treating physician, which means the ALJ must set forth specific and legitimate reasons for affording little weight to his opinion on Plaintiff's limitations. The ALJ specifically provided: "Little weight is given to Dr. Gerber's opinion, as it is not consistent with the medical record and he appears to rely heavily on the claimant's self-reported symptoms and limitations, which, as discussed above, are inconsistent with the overall medical evidence of record." (Admin. R. at 25.)

The limitations set forth by Dr. Gerber in his evaluation are inconsistent with records and opinions of other treating and examining physicians. A number of medical providers found Plaintiff had fully recovered from her 2013 injury, and could return to work without restrictions as of December 2013. Additionally, the record contains numerous notes from medical providers that Plaintiff had a normal gait, muscle tone, strength, range of motion, reflexes, and sensation in her lower limbs, was able to walk independently, and demonstrated no gross neurological deficits. Moreover, Dr. Gerber rarely, if ever, commented on Plaintiff's limitation in his examination notes,

PAGE 40 - OPINION AND ORDER

arguably implying the absence of any severe restrictions.  All of this evidence is inconsistent with Dr. Gerber's statement Plaintiff could only sit for one hour and stand or walk for one hour in an eight-hour day, needed to lie down and rest many times a day, and would miss more than four days of week per month.  While these inconsistencies could be viewed in a neutral manner, or even in Plaintiff's favor, the ALJ's interpretation of the evidence also is reasonable.  The court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Burch*, 400 F.3d at 680-81 (quoting *Magallanes*, 881 F.2d at 750).  As discussed above, the ALJ was justified in discrediting Plaintiff's testimony regarding the severity of her limitations, which provides a legitimate ground for discounting Dr. Gerber's limitations to the extent those limitations are based on this testimony.  The ALJ did not err in rejecting the severe limitations identified by Dr. Gerber in the December 2016 evaluation.

## Conclusion

The Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are supported by substantial evidence.  The decision of the Commissioner is AFFIRMED.

DATED this _7th_ day of May, 2020.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 41 - OPINION AND ORDER